[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 07-11827

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 27, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-20861 CV-PCH

DWIGHT JOHANNES DOWNS,

Plaintiff-Appellant,

versus

UNITED STATES ARMY CORPS OF ENGINEERS,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Florida

(May 27, 2009)

ON PETITION FOR REHEARING

Before DUBINA, BLACK and FAY, Circuit Judges.

PER CURIAM:

We grant the government's petition for rehearing, withdraw our previous opinion dated March 4, 2009, and substitute the following opinion in its place:

Plaintiff-Appellant, Dwight Johannes Downs ("Downs"), seeks review of the district court's grant of summary judgment to Defendant-Appellee, the United States, and dismissal of Downs's claim for negligence under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–80 (2006). *See Downs v. United States*, No. 06-20861, 2007 U.S. Dist. LEXIS 19023, 2007 WL 842136 (S.D. Fla. Mar. 20, 2007). Downs asserts that the United States Army Corps of Engineers ("Corps") negligently undertook its duty to ensure the quality of fill material used in the Miami Beach re-nourishment project in the 1970s and 1980s and negligently failed to warn about known potential dangers that resulted from its actions, thereby proximately causing Downs's injuries when he dove into the Miami Beach surf and struck his head on a "basketball-sized" rock, rendering him a quadriplegic. Downs sued under the Federal Tort Claims Act ("FTCA"). The district court dismissed the case as, *inter alia*, falling under the discretionary function exception to the FTCA. The issue before us is whether the Local Cooperation Agreement with Dade County ("LCA") under which the Corps acted established a mandatory duty that precludes application of the discretionary function exception, thus subjecting the United States to suit under the FTCA for

2

the alleged negligence. Because we conclude from the record that the district court improperly construed the Corps' contractual duties, we reverse and remand for reconsideration in light of this opinion.

## I. BACKGROUND

On a motion for summary judgment, all facts are read in the light most favorable to the non-moving party. Fed. R. Civ. P. 56; *see also Powers v. United States*, 996 F.2d 1121, 1125 (11th Cir. 1993) ("Because we review here the district court's dismissal of the plaintiffs' complaints for lack of subject matter jurisdiction, we accept the plaintiffs' factual allegations as true."). The facts here are therefore presented in that light.

On April 8, 2003, Downs dove headfirst into the ocean in the area of Miami Beach, Miami-Dade County, Florida, between 70th and 73rd Streets. He struck his head on a rock in the water, which he approximates to be the size of a basketball. Downs broke his neck and was rendered a quadriplegic.

The area of the beach where the incident occurred was part of a large re-nourishment project in the 1970s and 1980s that was designed to curb erosion of the beach, The Dade County Beach Nourishment and Hurricane Surge Protection Project ("Dade Project"). The Dade Project was authorized by Congress and

3

executed by the Corps through an agreement with the county. The LCA between Dade County and the Corps set forth the respective responsibilities of each party.

The district court opinion outlines details of the project. *See Downs*, 2007 U.S. Dist. LEXIS 19023, at *4–7, 2007 WL 842136, at *2–3. We describe the project in brief, here. The Dade Project involved dredging fill material from other areas and filling the beach area, including the surf zone, with approximately nine vertical feet of material. The LCA contained the following clause regarding the fill material to be used: "The parties mutually agree that only suitable material will be used for project beach fill, such suitable material being defined as non-rocky, sandy material similar to that of the existing beach." (R. 1 at 8.)

The Corps contracted with private companies to complete the work. For the section of beach at issue in this case, the Corps contracted with Construction Aggregates Corporation ("CAC"). Under the terms of the contract, including modifications made during the project, approximately five percent of rock by volume, ranging in size from two to ten inches in diameter, would be interspersed in the material deposited on the beach. The contract required CAC to remove all such rock to a depth of twelve inches. CAC was to design the method of removal. After further negotiation, the Corps allowed CAC to bury the rock instead of removing it.

4

Downs brought suit against the United States for negligence pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–80, alleging that the Corps violated the LCA when it negligently filled the beach area with rocks and that the agreement with CAC was insufficient because it did not require removal of all of the potential rocks, including those under two inches in diameter and those below the top twelve inches of the fill.[1]  In addition, Downs alleged that despite the Corps' knowledge of the danger of the rocks, it failed to take action to correct the known danger and failed to warn the public of the dangers presented by the rocks. He also alleged that the Corps violated the Clean Water Act, 33 U.S.C. § 1251, *et seq.* (2006), because rocks are considered pollutants within the meaning of the Act.

In its motion for summary judgment, the government asserted that it was entitled to summary judgment because (1) it is immune from suit under the Flood Control Act of 1968; (2) it is immune from suit under the independent contractor exception to the FTCA; and (3) it is immune from suit under the discretionary function exception to the FTCA.

---

[1] Downs originally filed this action against the Corps.  The parties later stipulated that the United States should be substituted as the properly named party.  (R. 17 at 1.)

The district court first found that the Flood Control Act does not apply to the waters where Downs was injured and also concluded that the Clean Water Act does not prevent the government from availing itself of the discretionary function exception in this case. The district court then concluded that the independent contractor exception and the discretionary function exception to the FTCA preclude Downs's claims. In doing so, the district court concluded that the LCA is a contract and that, as such, duties enumerated in it can establish mandatory duties the negligent performance of which subject the United States to suit under the FTCA. The district court found, however, that the duty at issue in this case—to ensure that the fill material used was made of "suitable material being defined as non-rocky, sandy material similar to that of the existing beach"—was "an impossible goal" that made an interpretation of the agreement to mean the Corps was required "to ensure the absence of all rocks" "absurd" and that, as a "one-line prohibition . . . contradicted by numerous other documents in a complex governmental project," it "[did] not prescribe a fixed and ascertainable standard" sufficient to "deprive the government of discretion in dealing with the rock problem." *Downs*, 2007 U.S. Dist. LEXIS 19023, at *28, 2007 WL 842136, at *9–10. Having found that the LCA left decisions about what rock could remain in

6

the fill material to the discretion of Corps employees,[2] the district court went on to conclude that this discretion was of the type that the discretionary function exception is designed to protect. The district court granted the government's motion for summary judgment based on sovereign immunity and entered final judgment for the government.

Downs only appeals the district court's decision regarding the discretionary function exception of the FTCA. To the extent Downs attempted to sue the Corps on the ground that it negligently contracted for services or negligently supervised the work of CAC, the district court's dismissal stands. Downs claims that the suit arises under the duties created by the terms of the LCA and retained by the Corps. The district court found that these duties met the discretionary function exception.

In this appeal, the government challenges the district court's conclusion that the LCA is a contract that establishes duties of the type implicated by the FTCA. Downs argues that the contract establishes such duties and that the contract term in question is sufficiently clear to create a mandatory duty.

---

[2] The district court also concluded that the Corps' General Design Memorandum for the Miami Beach re-nourishment projects and its addenda and the State of Florida's permit for the Dade Project did not mandate the absence of rocks in the fill material. These conclusions were not appealed.

The ultimate question on appeal is whether the discretionary function exception to the FTCA bars Downs's suit against the United States for the alleged failure of the Corps to ensure that a basketball-sized rock was removed from beach fill material used in the Dade Project. We conclude that voluntarily-entered contracts can establish binding duties that subject the government to suit under the FTCA, and that the LCA is the type of contract that can create a mandatory duty under the FTCA. However, because we also conclude that the district court erred in its construction of the contract, we reverse the grant of summary judgment and remand this case for the district court to appropriately apply these principles, construe the contract term in question, and determine if the Corps retained any discretionary duty the exercise of which the government would have expected to include policy considerations within the meaning of the discretionary function exception. We do not consider the merits of Downs's underlying tort claim because that issue is not before us on appeal. The only issue properly before us is the district court's jurisdictional analysis regarding the discretionary function exception.

## II. STANDARDS OF REVIEW

This court reviews a district court's interpretation and application of the discretionary function exception to the Federal Tort Claims Act *de novo*. *Ochran*

8

*v. United States*, 117 F.3d 495, 499–500 (11th Cir. 1997); *Powers*, 996 F.2d at 1123; *see also Burlison v. McDonald's Corp.*, 455 F.3d 1242, 1245 (11th Cir. 2006) (district court's interpretation of a federal statute is reviewed *de novo*); *Wexler v. Anderson*, 452 F.3d 1226, 1230 (11th Cir. 2006) (district court conclusions of law are reviewed *de novo*). Interpretation of contract language is a question of law that we review *de novo*. *Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1065 (11th Cir. 2004). A district court's interpretation of a state statute also is reviewed *de novo*. *Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286, 1294 (11th Cir. 2002).

## III. ANALYSIS

A. *The Discretionary Function Exception, 28 U.S.C. § 2680(a)*

The FTCA waives the U.S. government's sovereign immunity from suit in federal courts for the negligent actions of its employees. *See* 28 U.S.C. §1346(b) (2006). It subjects the United States to liability for torts in generally the same manner and to the same extent as private individuals under like circumstances. 28 U.S.C. § 2674. The waiver is limited by several explicit exceptions, including the discretionary function exception at issue in this case. The discretionary function exception precludes government liability for "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary

9

function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

The Supreme Court has enunciated a two-part test for determining whether a government employee's action or omission falls within the discretionary function exception.  *United States v. Gaubert*, 499 U.S. 315, 322–23, 111 S. Ct. 1267, 1273–74, 113 L. Ed. 2d 335 (1991); *Autery v. United States*, 992 F.2d 1523, 1526 (11th Cir. 1993).  First, the court is to consider the nature of the conduct and determine whether it involves "an element of judgment or choice."  *Gaubert*, 499 U.S. at 322, 111 S. Ct. at 1273 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954, 1958, 100 L. Ed. 2d 531 (1988)); *Powers*, 996 F.2d at 1124.  Second, if the conduct at issue involves the exercise of judgment, the court must determine whether that judgment is grounded in considerations of public policy.  *Gaubert*, 499 U.S. at 322–23, 111 S. Ct. at 1273–74.  Only then does the discretionary function exception apply.  *Id.*

Government conduct does not involve an element of judgment or choice, and thus is not discretionary, if "a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'"  *Id.* at 322, 111 S.

Ct. at 1273 (quoting *Berkovitz*, 486 U.S. at 536, 108 S. Ct. at 1958–59); *see also Powers*, 996 F.2d at 1124 (providing examples of cases in which the relevant statute or policy was found to prescribe a specific course of action).

Contracts voluntarily entered into by the federal government can establish duties the breach of which are actionable under the FTCA. The district court outlined cases from numerous circuits where courts "have recognized that the government's voluntarily assumed contractual obligations can impose nondiscretionary duties on government employees." *Downs*, 2007 U.S. Dist. LEXIS 19023, at *17, 2007 WL 842136, at *6. We agree with these courts and find that this conclusion comports with our precedent.

In *Andrews v. United States*, 121 F.3d 1430 (11th Cir. 1997), we suggested that contractual obligations may impose mandatory duties upon an agency or its employees. *See Andrews*, 121 F.3d at 1439–41. There, we approved of the district court's finding that pursuant to waste management contracts, the Navy had mandatory duties that rendered the discretionary function exception inapplicable. *Id.* at 1440–41. Similarly, in *Ochran v. United States*, 117 F.3d 495 (11th Cir. 1997), we agreed that where the government enters into a special relationship by voluntarily undertaking a state-law duty, a claim under the FTCA can be pursued. *Ochran*, 117 F.3d at 505. We went on to say that the discretionary function

11

exception still applies and bars suit against the United States "if the discharge of this state-law duty involves judgments grounded in considerations of public policy." *Id.*

"'The purpose of the [discretionary function] exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Id.* at 499 (internal quotation marks omitted) (quoting *Gaubert*, 499 U.S. at 323, 111 S. Ct. at 1273). Decisions that involve these considerations fall within the exception. *Id.* The court is not to "focus on the subjective intent of the government employee or inquire whether the employee actually weighed social, economic, and political policy considerations before acting. [Instead, the court is to] 'focus on the nature of the actions taken and on whether they are susceptible to policy analysis.'" *Id.* at 500 (quoting *Gaubert*, 499 U.S. at 325, 111 S. Ct. at 1275). "[I]t is not relevant whether the government employee in fact made a policy judgment . . . ." *Id.* at 501. "[T]he burden of production of the policy considerations that might influence the challenged conduct [is] on the Government." *Id.* at 504 n.4.

A policy, statute, regulation, or contract that indicates an employee "shall" do something may leave room for policy-based judgments that fall within the discretionary function exception. *Id.* at 500–01. For example, in *Ochran* we

12

explained that although an Assistant United States Attorney ("AUSA") "*shall make the necessary and appropriate arrangements to enable victims and witnesses to receive reasonable protection against threat, harm and intimidation from a suspected offender*," the discretionary function exception applies because the AUSA retains the authority to determine if *any* action is "necessary and appropriate," not only *which* action is reasonable and *when* it should take place. *Id.* at 500 (quoting AUSA guidelines (emphasis added)). On the other hand, a provision may leave room for the exercise of "choice or judgment" in the discharge of duties but not fall within the discretionary function exception. *Id.* at 501. By example, AUSA guidelines state that "information on the prohibition against intimidation and harassment and the remedies therefore *shall routinely be made available* to victims and witnesses"; the duty to inform a victim or witness is not protected by the discretionary function exception because the AUSA does not retain discretion over whether to inform, and there are no policy considerations that might influence *when* and *how* to inform. *Id.* at 500, 504 (quoting AUSA guidelines (emphasis added)). Therefore, "if a government official in performing his . . . duties must act without reliance upon a *fixed or readily ascertainable standard*, the decision he makes is discretionary and within the discretionary function exception." *Powers*, 996 F.2d at 1124 (citations and internal quotation

13

marks omitted). If the standard, however, is clear, the government official may maintain discretion over how to meet that standard, without retaining discretion over whether or not to do so.

"[W]hether decisions . . . fall within the discretionary function exception turns . . . on whether the judgments involved are grounded in policy considerations." *Ochran*, 117 F.3d at 501. Policy judgments can include, for example, considering the strength of the federal interest in undertaking the action and budgetary considerations. *Id.* at 501–02. "[B]ecause budgetary constraints are almost always important to government decisions, [however, ]not 'every choice [that implicates such constraints] is a policy judgment shielded from liability through the operation of the discretionary function exception.'" *Id.* at 502. Thus, "[t]he relevant inquiry in these cases is whether the government expects the employee who is making the choice in question to consider the policy implications of that choice." *Id.*

B. *The LCA*

The government asserts that the LCA is not the type of contract that can establish mandatory duties actionable under the FTCA. The government argues that local entities may be required to give assurances to the federal government before certain projects are undertaken, that cooperative agreements such as the

14

LCA are not "typical government contract[s]," and that the Contracts Dispute Act does not govern cooperative agreements, so "this Court would be hard-pressed to hold that the Corps 'has no rightful option but to adhere to the [LCA].'" (Br. of Appellee 31.)

The district court found:

Both the Corps and Dade County voluntarily, and in consideration for the other's actions, entered into the local cooperation agreement. Indeed, the government even acknowledges that, while local cooperation agreements are not governed by federal acquisition regulations, their enforceability has been recognized by Congress. . . . As an enforceable agreement . . . the [LCA] was therefore a contract capable of mandating specific action, as contemplated in the discretionary function exception.

*See Downs*, 2007 U.S. Dist. LEXIS 19023, at *21–22, 2007 WL 842136, at *7.

We find the district court's analysis that the LCA created a binding contract implicated by the FTCA persuasive and on that basis need not further consider the government's argument that there are different types of contracts or agreements that, by definition, have varying weight under the FTCA.

C. *The Corps' Duties Under the LCA*

15

The district court concluded that the duty at issue—to ensure that the fill material used was made of "suitable material being defined as non-rocky, sandy material similar to that of the existing beach"—"[did] not prescribe a fixed and ascertainable standard" that "deprive[d] the government of discretion in dealing with the rock problem." *Id.*, 2007 U.S. Dist. LEXIS 19023, at \*29, 2007 WL 842136, at \*10. The court determined that the Corps retained full discretion about what type of rocks and how many could remain in the fill material. The district court reached this conclusion by first looking at the plain language of the contract and stating: "On the one hand, this appears to be straightforward language requiring that the government only use non-rocky materials. To the extent the government did in fact permit the inclusion of rocks within the fill, it ran afoul of this mandatory language. On the other hand, the contract does not specifically prescribe a method for ensuring the absence of rocks in the fill." *See id.*, 2007 U.S. Dist. LEXIS 19023, at \*23, 2007 WL 842136, at \*7. The district court then analyzed parol evidence to conclude that the terms of the LCA could not mean that all rocks had to be removed from the fill.

Instead of strictly interpreting the meaning of "non-rocky, sandy material," the district court analyzed the contract term only to determine if it required the removal of *all* rocks, the interpretation suggested by Downs. At the government's

16

urging, the district court "read [the LCA] in the context of the entire Dade Project," *id.*, 2007 U.S. Dist. LEXIS 19023, at *26, 2007 WL 842136, at *9, and concluded that "[w]ith these facts in mind, the local cooperation agreement cannot be read in a way that would require the Corps to eliminate any and all rocks," *id.*, 2007 U.S. Dist. LEXIS 19023, at *29, 2007 WL 842136, at *10. The court considered the following evidence relevant to its decision:

- The Corps told Congress when initially requesting funds for the re-nourishment project that it would use all the material dredged, including rocks.

- The volume of fill material required makes it unreasonable or hard to imagine that all rocks were to be removed.

- Dade County worked with the Corps to remove rocks and "did not allege any failure on the part of the Corps to observe the terms" of the agreement.

- According to Downs's expert, it was not possible to remove all rocks four inches or smaller.

*Id.*, 2007 U.S. Dist. LEXIS 19023, at *26–29, 2007 WL 842136, at *9–10.

Ultimately, the district court concluded that

17

the one-line prohibition of rocky materials included in the local cooperation agreement cannot alone serve to mandate action when it is contradicted by numerous other documents in a complex governmental project. Viewing the language of the [LCA] in that context, it does not prescribe a fixed and ascertainable standard by stating that the beach fill would contain only non-rocky material. Thus, the [LCA] did not deprive the government of discretion in dealing with the rock problem.

*Id.*, 2007 U.S. Dist. LEXIS 19023, at \*29, 2007 WL 842136, at \*10.

The government correctly asserts that the United States' interest in this case is such that federal common law applies to determine the government's duties relevant to the FTCA. *See United States v. Seckinger*, 397 U.S. 203, 209–10 (1970); *Begner v. United States*, 428 F.3d 998, 1004 (11th Cir. 2005). Under federal common law, however, we "look to general common law on contracts," *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1307 (11th Cir. 2008), and may use principles of state common law to guide our analysis, *see, e.g.*, *Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 638 (4th Cir. 1995) (stating that when interpreting an ERISA plan under federal common law, the court "may use principles of state common law to guide [the court's] analysis"). We previously have stated that in such circumstances, "when determining what particular

18

doctrine to apply in a particular suit, the court will often select a rule of state law."
*Begner*, 428 F.3d at 1004–05 (internal quotation marks omitted) (relying in part on Georgia contract law where federal common law governed interpretation); *see also United States ex rel. Garrett v. Midwest Constr. Co.*, 619 F.2d 349, 352 (5th Cir. 1980)[3] (asserting that federal common law applies, but borrowing principles from Texas law).  Accordingly, we look primarily to the law of Florida, where most of the events took place.  *Cf. Begner*, 428 F.3d at 1004–05 (relying in part on Georgia contract law to interpret a contract between private citizens and the Internal Revenue Service to which federal common law applied "because most of the events occurred in Georgia").

We conclude from the record that the district court's analysis does not comport with general principles of contract law; the court should not have turned to parol evidence before finding the contract term ambiguous, and had the court found the term ambiguous, it should have limited itself to defining the term instead of effectively removing it.  Additionally, the court erred when it found that a contractually defined duty that must be elucidated with parol evidence equates to the absence of any mandatory duty at all.

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

19

### 1. Misuse of parol evidence

The district court first erred by using parol evidence to determine that the term "non-rocky, sandy material similar to that of the existing beach" is ambiguous (or, as the court indicated, an impossible goal and therefore not a duty at all). A contract term must be ambiguous on its face before a court can resort to parol evidence to define that term. *J.M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So. 2d 484, 485–86 (Fla. 1957) ("The rule inhibits the use of parol evidence to contradict, vary, defeat, or modify a complete and unambiguous written instrument, or to change, add to, or subtract from it, or affect its construction." (internal quotation marks omitted)); *accord Begner*, 428 F.3d at 1004–05 (using Georgia contract law to guide federal common law analysis and stating that parol evidence is admissible only to prove the meaning of ambiguities in the contract); *Midwest Constr. Co.*, 619 F.2d at 352 ("Under federal common law, as under the law of most states, . . . parol evidence is admissible to prove the meaning of ambiguities in contract language."); *Funeral Fin. Sys. v. United States*, 234 F.3d 1015, 1018 (7th Cir. 2000) (stating that under federal common law extrinsic evidence is only considered where the language of the contract is ambiguous, otherwise "the written words of the contract . . . dictate the disposition"). The district court never made this facial determination.

Nevertheless, we conclude that the term is facially ambiguous because it is subject to varying interpretations.[4] *See Friedman v. Va. Metal Prods. Corp.*, 56 So. 2d 515, 517 (Fla. 1952) ("The term 'ambiguous' means susceptible of more than one meaning."); *accord Tanadgusix Corp. v. Huber*, 404 F.3d 1201, 1205 (9th Cir. 2005) ("A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation." (internal quotation marks omitted)). Parol evidence thus was needed to elucidate the term.

Once the district court undertook to define the term using extrinsic evidence, it erred when it started with the presumption that the term was to mean that there were no rocks at all in the fill material. The court essentially defined the term and then used parol evidence to find that the definition was unreasonable and therefore created no duty at all. Instead, the court should have analyzed only what the term meant.

---

[4] Downs asserts that the phrase "non-rocky, sandy material similar to that of the existing beach" unambiguously means the elimination of all rocks from the fill material. Neither this entire phrase nor terms within it are defined further in the LCA and the words used are not subject to clear and plain meaning. For example, turning to but one source for the common meaning of "rocky," we note *The American Heritage Dictionary* definition of the word: "Consisting of, containing, or abounding in rock or rocks." *The American Heritage Dictionary of the English Language* 1124 (New College ed. 1976). Even this definition contains terms that are not clearly defined, including "containing," "consisting of," and "abounding." We find that all such terms are insufficiently concrete to clearly define a quantity, particularly "zero." Furthermore, the record itself demonstrates the ambiguity of "non-rocky"; it is rife with references to different sized rocks, from those smaller than one inch in diameter to those "basketball sized" or larger.

21

Ultimately, the district court said that there was no "non-rocky, sandy material" requirement at all because, among other things, the dredging equipment used at the time made removal of all rocks equal to or smaller than four inches in diameter impossible. *Downs*, 2007 U.S. Dist. LEXIS 19023, at *27, 2007 WL 842136, at *9. We think it appropriate for the district court to have considered professional standards of the time when construing the contract term, *see Underwood v. Underwood*, 64 So. 2d 281, 288 (Fla. 1953) ("In the construction of written contracts it is the duty of the court, as near as may be, to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion, and apparent object of the parties, to determine the meaning and intent of the language employed." (emphasis and internal quotation marks omitted)), but such evidence should not have been used to read out the term altogether. Without weighing the evidence, we also note that the record reflects that rocks could have been removed from the fill material by means other than through the dredging process, such as by passing the material through screens, grating the sand, or crushing the rock, and that on summary judgment the district court must view all permissible evidence in the light most favorable to the non-moving party. Finally, upon remand, the district court should consider all words in the disputed contract term, including "similar to that of the existing beach,"

22

which, subject to examination of parol evidence, may provide a measurable standard for the Corps' duty. *See Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 941 (Fla. 1979) ("Every provision in [the] contract should be given meaning and effect . . . ." (internal quotation marks omitted)); *see also Tanadgusix*, 404 F.3d at 1205 (indicating that when interpreting a contract under federal common law, the court should "construe the contract by reading it as a whole and interpreting each part with reference to the entire contract. The terms of the contract control, regardless of the parties' subjective intentions shown by extrinsic evidence." (citation omitted)).[5]

## 2. Contract ambiguity does not mean the absence of a duty

Second, the district court erred by conflating ambiguity of the terms creating the Corps' duty with whether or not the Corps had a duty at all. Ambiguous

---

[5] The district court also concluded that because "the contract does not specifically prescribe a method for ensuring the absence of rocks in the fill," it fails to meet the specificity requirement for liability under the FTCA. *Downs*, 2007 U.S. Dist. LEXIS 19023, at \*23, 2007 WL 842136, at \*7. We disagree. A defined safety or other construction standard can create a mandatory duty to meet that standard, by whatever means. This reasoning is consistent with our decision in *Ochran*, cited above, wherein we said that a government policy to provide information to witnesses and victims created a sufficiently mandatory duty to establish liability under the FTCA even though when and how to provide that information was left to government employee discretion. *Ochran*, 117 F.3d at 500, 504. Similarly, in *ARA Leisure Services v. United States*, 831 F.2d 193 (9th Cir. 1987), the Ninth Circuit held that a National Park Service standard that required that park roads "conform to the original grades and alignments" and be "firm, [and] of uniform cross section" was sufficiently specific to create a mandatory duty, even without delineating the means by which the roads were to be maintained. *ARA Leisure Servs.*, 831 F.2d at 195.

23

contract terms do not obviate contract duties. By the terms of the contract, the Corps had a duty to ensure that all fill used for the project was "non-rocky, sandy material similar to that of the existing beach." The definition of "non-rocky, sandy material similar to that of the existing beach," as an ambiguous term, is subject to the court's review of parol evidence. The duty to ensure that the beach fill was of this sort, however, is clear. A contractual duty does not cease to exist because the terms of that duty are ambiguous and require elucidation by parol evidence. *See Excelsior Ins. Co.*, 369 So. 2d at 941 ("Every provision in [the] contract should be given meaning and effect . . . ." (internal quotation marks omitted)). Nor is an ambiguous term by definition insufficiently specific to establish a mandatory duty that subjects the government to suit under the FTCA.[6] Rather than reading-out the Corps' contractual duty, the district court should have determined the exact parameters of the duty; if the duty was sufficiently specific, "embodying a fixed or readily ascertainable standard," *see Autery v. United States*, 992 F. 2d 1523, 1529 (11th Cir. 1993) (emphasis and internal quotation marks omitted), to subject the

---

[6] To the extent parol evidence evidences a clear, quantifiable standard for the fill material, the contract establishes a mandatory duty. Hypothetically, for example, if on remand parol evidence shows that the parties agreed that the term "non-rocky, sandy material, similar to that of the existing beach" means that the fill material was to be no more than 5% rock by volume with no individual rocks larger than 4 inches in diameter, then the standard is sufficiently specific to establish a mandatory duty.

24

government to suit; and whether exercise of the contractual duty involved policy-based discretion of the type implicated by the discretionary function exception.[7]

## IV. CONCLUSION

For the reasons set forth above, we conclude that the district court's grant of summary judgment and dismissal of the plaintiff's case for lack of subject matter jurisdiction merits reversal. The district court correctly determined that the LCA is a contract between the Corps and Dade County and that such contracts can establish mandatory duties that implicate liability under the FTCA. The district court erred, however, when it concluded that ambiguity in a contract term equates to government discretion to decide whether or not to adhere to that term. The district court also erred when it construed the contract term in question using parol evidence without first determining the term was ambiguous, and further erred when it failed to follow general contract law principles in applying parol evidence

---

[7] We note that the policy analysis previously conducted by the district court is not applicable to this particular inquiry because it is based on the district court's determination that the Corps retained discretion to determine what type of fill material could be used. In addition, the district court's policy conclusions relevant to the independent contractor exception to the FTCA do not implicate the matters appealed. Finally, the district court's analysis does not indicate what specific policies may have been implicated in the Corps' decisionmaking, which limits this court's ability to review its conclusions. Although the district court noted that "[c]ourts have consistently recognized that the policy decisions in beach erosion projects warranted protection under the discretionary function exception," the cases cited are limited to those where the design plans were left entirely in the hands of the Corps, not in situations like this one where relevant elements of the design were described by statute, regulation, policy, or contract. *See Nat'l Union Fire Ins. v. United States*, 115 F.3d 1415, 1422 (9th Cir. 1997).

to its analysis.  Accordingly, we reverse the grant of summary judgment and remand this case to the district court.  On remand, after appropriately using parol evidence to construe the contract term, the district court should determine if the Corps' duty, so defined, was sufficiently specific to subject the government to suit. If so, the district court then should determine whether exercise of the contractual duty involved policy-based discretion of the type implicated by the discretionary function exception.

**REVERSED AND REMANDED.**